UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW CARTER,<br><br>Plaintiff,<br><br>vs.<br><br>KELLIE WASKO, SECRETARY OF CORRECTIONS, OFFICIAL CAPACITY; TERESA BITTINGER, WARDEN, OFFICIAL CAPACITY; JESSICA COOK, ASSOCIATE WARDEN, OFFICIAL CAPACITY; SAMUEL YOST, UNIT COORDINATOR, OFFICIAL CAPACITY; CRAIG MOUSEL, MAIL ROOM CLERK, OFFICIAL CAPACITY; TAMMY MERTENS-JONES, CULTURAL SPIRITUAL ACTIVITIES COORDINATOR, OFFICIAL CAPACITY; ARAMARK CORRECTIONAL SERVICES, LLC, IN ITS INDIVIDUAL AND OFFICIAL CAPACITIES; AND MARLIN'S INC., IN ITS INDIVIDUAL AND OFFICIAL CAPACITIES;<br><br>Defendants. | 4:22-CV-04103-RAL<br><br><br>OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

Plaintiff Matthew Carter, an inmate at the South Dakota State Penitentiary ("SDSP"), filed a pro se lawsuit under 42 U.S.C. § 1983. Doc. 1. This Court granted Carter leave to proceed in forma pauperis and ordered him to pay an initial filing fee. Doc. 6. After Carter timely paid his initial fee, this Court screened Carter's complaint under 28 U.S.C. § 1915A, dismissing the complaint in part and directing service upon defendants in part. Doc. 11. After his complaint was screened but before defendants had been served, Carter filed a motion to amend his complaint to add new defendants and to bring additional claims against the existing

defendants. Doc. 13. This Court granted Carter's motion to amend and screened his additional claims under 28 U.S.C. § 1915A. Doc. 26. Carter professes to be a Satanist, and his claims arise out of alleged infringement of his ability to practice his religion while in state custordy. *See generally* Docs. 1, 13. Carter has filed a motion for temporary restraining order enjoining the defendants from "torturing" him for his " 'devout' Satanic religious beliefs" and retaliating against him for filing this lawsuit.[1] Doc. 28. The defendants who have been served, Wasko, Bittinger, Yost, Mousel, and Merten-Jones, oppose Carter's motion for restraining order. Doc. 30.

## I. FACTUAL BACKGROUND

When Carter filed his motion for temporary restraining order, he was being held in the Special Housing Unit ("S.H.U."), allegedly for an "undetermined" amount of time. Doc. 28 at 1. While in the S.H.U., Carter claims he does not have access to any legal documents and is being denied "basic" human rights such as calling or writing his family and access to the courts. Id. Carter alleges that his mental health is at a "substantial risk of harm" due to his placement in the S.H.U. Id. at 2. He also asserts that the Warden, Deputy Warden, and Secretary of Corrections have threatened to place him in "gang housing" and directed the "gangs . . . to attack, hurt, [and] kill" him because he sued. Id. at 1. He asserts that he is "terrified for [his] life" because the Warden and Secretary of Corrections "are attempting to get [him] either really hurt (physically) or killed." Id. at 2.

---

[1] In his opposition to defendants' motion for an extension of time to answer, Carter requested a restraining order prohibiting defendants from retaliating against him and from further infringing on his freedom of religion. Doc. 24. But this request did not include any specific factual allegations to support Carter's request. Id.

2

Carter was placed in administrative detention after he was charged, in a disciplinary report dated February 6, 2023, with "[c]onduct which disrupts or interferes with the security or good order of the institution." Doc. 30-1; Doc. 32 ¶ 4. Carter had handed a correctional officer two sealed packages with the correctional officer's initials across the seals, but Carter had forged the correctional officer's initials. Doc. 32 ¶¶ 4-5. Carter appeared before the disciplinary hearing officer and stated that he would "like to plead the Fifth." Id. ¶ 6; Doc. 30-2. After the disciplinary hearing officer determined that the evidence submitted established that Carter had in fact forged the correctional officer's initials on the packages, Carter was sentenced to five days in disciplinary segregation. Doc. 30-2; Doc. 32 ¶¶ 6–7. Carter was given credit for the time he had already served in administrative detention for a "net" of zero days in disciplinary segregation. Doc. 30-2; Doc. 32 ¶ 7.

An inmate may be placed in administrative detention if he is "charged with violating a major offense in custody and is awaiting a hearing" or "the offense in custody the inmate is charged with remains under investigation or review." Doc. 30-18 at 3–4; Doc. 32 ¶ 9. "Inmates placed in administrative detention pending investigation for committing an offense in custody [] should not remain in administrative detention for longer than fifteen consecutive days." Doc. 30-18 at 4; Doc. 32 ¶ 9.

On February 27, 2023, Carter was released from the S.H.U. to return to the general population. Doc. 30-3; Doc. 32 ¶ 15. Carter refused to leave the S.H.U. Doc. 30-3; Doc. 32 ¶ 16. Because of his refusal, Carter was written up for a facility rules violation. Doc. 30-3; Doc. 32 ¶ 15. On March 3, 2023, Carter was released from the S.H.U., but after he returned to the cell hall, he again refused the housing assignment and was returned to the S.H.U. on the same day. Doc. 30-4; Doc. 32 ¶ 17.

After Carter was returned to the S.H.U. on March 3, 2023, he was written up for two other facility rules violations. Doc. 32 ¶ 18. On March 5, 2023, when a correctional officer informed Carter that it was inappropriate for Carter to refer to a correctional officer using the officer's first name, Carter responded with an obscenity and threatened to sue the officer. Doc. 30-5; Doc. 32 ¶ 19. On March 6, 2023, Carter was written up for throwing a breakfast tray out the handcuff port of his S.H.U. cell across to the opposite wall. Doc. 30-6; Doc. 32 ¶ 21.

Inmates housed in administrative detention have regular access to Behavioral Health staff. Doc. 30-18 at 4; Doc. 32 ¶ 11. On February 6, 2023, before Carter was placed in the S.H.U., he was evaluated by Health Services staff and "cleared for admission" in the S.H.U. Doc. 30-7; Doc. 31 ¶ 6; Doc. 32 ¶ 13. On March 3, 2023, when Carter was returned to the S.H.U. because he refused assignment in the general population, Carter was again evaluated by Health Services staff and cleared for admission in the S.H.U. Doc. 30-17; Doc. 32 ¶ 13. The DOC disciplinary housing policy provides for transfer from administrative detention to a secured mental health housing as deemed appropriate by Behavioral Health staff and the Associate or Deputy Warden. Doc. 30-18 at 5.

When an inmate is housed in the S.H.U., the inmate is seen by Health Services every two or three days when the nursing staff conducts rounds. Doc. 31 ¶ 8. During rounds, the nursing staff asks the inmate whether there are any medical or mental health issues or concerns. Id. From February 8 to February 26, 2023, Health Services saw Carter nine times during rounds for "Segregation Observation." Docs. 30-19–30-27; Doc. 31 ¶ 9. During each "Segregation Observation" encounter, nursing staff asked Carter whether there were any medical or mental health issues or concerns. Docs. 30-19–30-27; Doc. 31 ¶ 10. Carter did not notify the nursing staff of any medical or mental health issues or concerns. Docs. 30-19–30-27; Doc. 31 ¶ 10.

Health Services saw Carter seven times from March 3, 2023 to March 12, 2023, for "Segregation Observation" during rounds. Docs. 30-28–30-34; Doc. 31 ¶ 14. During these encounters, Carter did not notify the nursing staff of any medical or mental health issues or concerns. Docs. 30-28–30-34; Doc. 31 ¶ 15.

While Carter was in the S.H.U., he submitted kites that were addressed during sick call. Docs. 30-8, 30-10–30-15; Doc. 31 ¶¶ 16–19, 21, 24. In the kites and subsequent sick call encounters, Carter did not raise any mental health concerns. Docs. 30-8, 30-10–30-15; Doc. 31 ¶¶ 16–19, 21, 24. On February 16, 2023, Carter was seen for a "Chronic Disease Encounter and State Mandated Physical." Doc. 30-13; Doc. 31 ¶ 20. He did not report any mental health concerns. Doc. 30-13.

On March 2, 2023, Carter reported a new onset of seizures and stated that he had experienced seven seizures in the last couple of days. Doc. 30-16. Carter questioned whether the seizures had "anything to do with being housed in the SHU for too long and being alone, otherwise [he was] unsure of what [was] causing [the seizure] activity." Id. at 1. When the nursing staff asked Carter why neither he nor his cellmate had activated the call light during any of the seizures, Carter responded, "I don't know[.]" Id. Carter was educated that during a seizure medical should be called to intervene. Id. The next day, the nursing staff reiterated that it was imperative to hit the call light for assessment if he had any further seizure activity. Doc. 30-17; Doc. 31 ¶ 30. There is no evidence in the record that Carter reported any further seizure activity.

## II.   ANALYSIS

A temporary restraining order is issued only in the extremely rare instance in which court action must be taken without notice to the nonmoving party. Fed. R. Civ. P. 65(b). Because

defendants were provided notice and filed a response, the Court will construe Carter's motion as a request for a preliminary injunction. See Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").

A preliminary injunction is an "extraordinary and drastic remedy[.]" Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (citation omitted). Carter, the party seeking preliminary relief, bears the burden of establishing the elements necessary for relief. Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003). Whether a preliminary injunction should issue is decided by weighing the four Dataphase factors: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). In a prison setting, a request for a preliminary injunction "must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.' " Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (quoting Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982)).

### A. Carter's Allegation that the Warden and Secretary of Corrections Are Torturing Him.

Carter seeks preliminary injunctive relief because the Warden and Secretary of Corrections are torturing him for his "devout" Satanic religious beliefs. Docket 28 at 1. To the extent Carter is seeking a preliminary injunction because in the S.H.U. he lacks access to legal documents or to the courts and cannot call or write his family, Carter's motion must be denied because his request for preliminary injunctive relief is not related to the allegations in his complaint or his amended complaint. The purpose of preliminary relief, such as a temporary restraining order or preliminary injunction, is to preserve the status quo and prevent irreparable

6

harm until the court has an opportunity to rule on the merits of the complaint. Dataphase, 640 F.2d at 113 n.5 (citation omitted). A plaintiff seeking injunctive relief "must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam). "It is inappropriate to grant a preliminary injunction for matters 'lying wholly outside the issues in the suit.' " Brakeall v. Stanwick-Klemik, 4:17-CV-04101-LLP, 2019 WL 3807272, at *1, 2019 U.S. Dist. LEXIS 136069, at *2 (D.S.D. Aug. 13, 2019) (quoting DeBeers Consol. Mines v. United States, 325 U.S. 212, 220 (1945)). In his § 1983 action, Carter does not assert denial of access to the courts or violation of First Amendment right to call or write his family. Docs. 1, 13. To the extent Carter seeks preliminary injunctive relief because does not have access to the courts and cannot call or write his family while in the S.H.U., his request is denied. Devose, 42 F.3d at 471 (upholding district court denial of motion for preliminary injunction whether motion was based on new assertions of misconduct that were different from claim raised).

Carter's request for a preliminary injunction prohibiting his housing in the S.H.U. is also denied because he has not met his burden of establishing that his placement in the S.H.U. is in any way related to the Warden and Secretary of Corrections torturing him for his Satanic religious beliefs. In response to Carter's motion for preliminary injunction, defendants submitted an affidavit, Doc. 32, and disciplinary reports, Docs. 30-1, 30-3–30-6, establishing that Carter's placement in the S.H.U. was consistent with the DOC's disciplinary housing policy and based upon facility rules violations rather than his religious beliefs. Carter has not disputed this evidence.

Finally, Carter has not provided any evidence to establish that the conditions of his confinement in the S.H.U. are "tortuous" and that his placement in the S.H.U. will irreparably

harm him. Carter's request for preliminary injunctive seems to be premised on the argument that placing a prisoner in a disciplinary housing unit or solitary confinement is, as a matter of law, unconstitutional. But this is not correct. "Segregating a prisoner from other prisoners, placing him in isolation or solitary confinement is not necessarily unconstitutional." Hancock v. Unknown United State Marshal, 587 F.2d 377, 378–79 (8th Cir. 1978) (per curiam) (citation omitted). Defendants have submitted evidence, which Carter does not dispute, that Carter refused two housing assignments that would have ended his placement in the S.H.U. Docs. 30-3–30-4; Doc. 32 ¶¶ 15-16. Carter's unsubstantiated allegation that the conditions of his confinement in the S.H.U. are "tortuous" cannot be reconciled with this undisputed evidence.

Carter also summarily alleges that his "mental health is at a 'substantial risk of harm[.]'" Doc. 28 at 2. Without a showing of irreparable harm, a preliminary injunction should not be issued. Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989) (en banc); see also Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."). To demonstrate irreparable harm, Carter must show that the harm is "certain, great and of such imminence that there is a clear and present need for equitable relief." Gard v. Kaemingk, 4:13-CV-04062-LLP, 2014 WL 4092776, at *2, 2014 U.S. Dist. LEXIS 114113, at *5-6 (D.S.D. Aug. 18, 2014) (quoting Packard Elevator v. Interstate Commerce Comm'n, 782 F.2d 112, 115 (8th Cir. 1986)). Carter has not met his burden of showing actual, substantial harm resulting from his placement in the S.H.U., and his unsubstantiated allegations cannot be reconciled with the evidence defendants submitted in opposition to his motion.

Before Carter was placed in the S.H.U., he was evaluated by Health Services staff and "cleared for admission" in the S.H.U. Doc. 30-7; Doc. 30-17; Doc. 31 ¶ 6; Doc. 32 ¶ 13. While

in the S.H.U., Health Services regularly assessed Carter during rounds. Doc. 31 ¶ 8. During rounds, Carter did not notify the nursing staff of any medical or mental health issues or concerns. Docs. 30-19–30-34; Doc. 31 ¶¶ 10, 15. While Carter was in the S.H.U., he submitted kites that were addressed during sick call. Docs. 30-8, 30-10–15; Doc. 31 ¶¶ 16–19, 21, 24. In the kites and subsequent sick call encounters, Carter did not raise any mental health concerns. Docs. 30-8, 30-10–15; Doc. 31 ¶¶ 16–19, 21, 24. Carter has not established that his placement in the S.H.U. places his mental health at substantial risk.

   B.   **Carter's Allegation that He Was Sent to the S.H.U. in Retaliation for Filing this § 1983 lawsuit.**

Carter alleges that he was sent to the S.H.U. in retaliation for filing this § 1983 lawsuit. Doc. 28. Once again, Carter has not submitted any evidence to substantiate this allegation, and Carter's unsubstantiated allegation cannot be reconciled with the evidence defendants submitted in opposition to his motion. As previously discussed, defendants submitted an affidavit, Doc. 32, and disciplinary reports, Docs. 30-1, 30-3–30-6, establishing that Carter's placement in the S.H.U. was consistent with the DOC's disciplinary housing policy and based upon facility rules violations. On the basis of this evidence, Carter's retaliatory discipline claim fails.[2] See Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008) (stating that a retaliatory discipline claim fails if the discipline was issued for the actual violation of a prison rule and there is "some evidence" that the inmate committed a rule violation).

---

[2] Carter's complaint includes allegations that he was placed in the S.H.U. in retaliation for filing grievances and his attempts to practice his religion. Doc. 1 at 13; Doc. 1-1 at 11. The Court makes no finding whether Carter has established a sufficient relationship between the retaliatory conduct asserted in his complaint and the alleged retaliatory conduct claimed in his request for preliminary injunctive relief as Carter's request is denied for other reasons as set forth in this Opinion.

9

### C. Carter's Allegations that Defendants Have Threatened Him

In his request for preliminary injunctive relief, Carter asserts that the Warden, Deputy Warden, and Secretary of Corrections have threatened to place him in "gang housing" and instructed the gangs "to attack, hurt [and] kill [him.] Docket 28 at 1. He asserts that he is "terrified for [his] life . . . [because] Mr. Dan. Sullivan[3] and Ms. Kellie Wasko are attempting to get [him] eitthert really hurt (physically) or killed." Id. These unsubstantiated, conclusory allegations devoid of even a single supporting fact are wholly insufficient to satisfy Carter's burden of establishing harm that is "certain, great and of such imminence that there is a clear and present need for equitable relief." See Gard, 2014 WL 4092776, at *2, 2014 U.S. Dist. LEXIS 114113, at *5-6.

### III. CONCLUSION

For the reasons stated above, it is hereby ORDERED:

1. That Plaintiff's request for a restraining order in his opposition to defendants' request for extension of time to answer, Doc. 24, is denied.

2. That Plaintiff's motion for temporary restraining order, which this Court construes as a motion for preliminary injunction, Doc. 28, is denied.

DATED this 28th day of June, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE

---

[3] Dan Sullivan is no longer Warden of the SDSP. Because Carter sued Warden Sullivan only in his official capacity, in accordance with Fed. R. Civ. P. 25(d), Sullivan is no longer a party to this action and Carter's request for preliminary injunctive relief against him is moot.