UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW CARTER,<br><br>Plaintiff,<br><br>vs.<br><br>KELLIE WASKO, SECRETARY OF CORRECTIONS, OFFICIAL CAPACITY; TERESA BITTINGER, WARDEN, OFFICIAL CAPACITY; JESSICA COOK, ASSOCIATE WARDEN, OFFICIAL CAPACITY; SAMUEL YOST, UNIT COORDINATOR, OFFICIAL CAPACITY; CRAIG MOUSEL, MAIL ROOM CLERK, OFFICIAL CAPACITY; TAMMY MERTENS-JONES, CULTURAL SPIRITUAL ACTIVITIES COORDINATOR, OFFICIAL CAPACITY; ARAMARK CORRECTIONAL SERVICES, LLC, IN ITS INDIVIDUAL AND OFFICIAL CAPACITIES; AND MARLIN'S INC., IN ITS INDIVIDUAL AND OFFICIAL CAPACITIES;<br><br>Defendants. | 4:22-CV-04103-RAL<br><br><br>OPINION AND ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER, REQUEST FOR THIS COURT TO INVESTIGATE HIS CLAIMS, AND MOTION COMPELLING 24/7 ACCESS TO LEXIS/NEXIS |

Plaintiff Matthew Carter, an inmate at the South Dakota State Penitentiary ("SDSP"), filed a pro se lawsuit under 42 U.S.C. § 1983. Doc. 1. This Court granted Carter leave to proceed in forma pauperis and ordered him to pay an initial filing fee. Doc. 6. After Carter timely paid his initial fee, this Court screened Carter's complaint under 28 U.S.C. § 1915A, dismissing the complaint in part and directing service upon defendants in part. Doc. 11. After his complaint was screened but before defendants had been served, Carter filed a motion to amend his complaint to add new defendants and to bring additional claims against the existing

defendants. Doc. 13. This Court granted Carter's motion to amend and screened his additional claims under 28 U.S.C. § 1915A. Doc. 26. Carter professes to be a Satanist, and his claims arise out of alleged infringement of his ability to practice his religion while in state custody. *See generally* Docs. 1, 27. Carter earlier filed a motion for temporary restraining order enjoining the defendants from "torturing" him for his " 'devout' Satanic religious beliefs" and retaliating against him for filing this lawsuit.[1] Doc. 28. The defendants who have been served--Wasko, Bittinger, Yost, Mousel, and Merten-Jones--opposed Carter's motion for restraining order. Doc. 30. On June 28, 2023, this Court entered an Opinion and Order Denying Plaintiff's Motion for Temporary Restraining Order. Doc. 40. As that was being entered, Carter filed a motion requesting to speak with the U.S. Marshals Service, Doc. 37, and another motion for restraining order, Doc. 38, again alleging that as a state inmate, he is being tortured. Defendants oppose Carter's renewed motion for temporary restraining. Doc. 41. In support of their opposition, Defendants submitted documentary evidence which establishes that the conclusory factual assertions in Carter's renewed motion are "blatant/outright lies in an on-going pattern of deceptiveness that appears to be nothing more than an attempt to mislead the Court." Id. at 10-11. Finally, Carter requests that this Court order that defendants allow him 24/7 access to Lexis/Nexis and phone calls. Doc. 43. This Court repeats must of what is previously has written in denying these new motions.

---

[1] In his opposition to defendants' motion for an extension of time to answer, Carter requested a restraining order prohibiting defendants from retaliating against him and from further infringing on his freedom of religion. Doc. 24. But this request did not include any specific factual allegations to support Carter's request. Id.

## I. FACTUAL BACKGROUND

When Carter filed his motion for temporary restraining order, he was being held in the Special Housing Unit ("S.H.U."), allegedly for an "undetermined" amount of time. Doc. 28 at 1. While in the S.H.U., Carter claims he does not have access to any legal documents and is being denied "basic" human rights such as calling or writing his family and access to the courts. Id. Carter alleges that his mental health is at a "substantial risk of harm" due to his placement in the S.H.U. Id. at 2. He also asserts that the Warden, Deputy Warden, and Secretary of Corrections have threatened to place him in "gang housing" and directed the "gangs . . . to attack, hurt, [and] kill" him because he sued. Id. at 1. He asserts that he is "terrified for [his] life" because the Warden and Secretary of Corrections "are attempting to get [him] either really hurt (physically) or killed." Id. at 2.

Carter was placed in administrative detention after he was charged, in a disciplinary report dated February 6, 2023, with "[c]onduct which disrupts or interferes with the security or good order of the institution." Doc. 30-1; Doc. 32 ¶ 4. Carter had handed a correctional officer two sealed packages with the correctional officer's initials across the seals, but Carter had forged the correctional officer's initials. Doc. 32 ¶¶ 4-5. Carter appeared before the disciplinary hearing officer and stated that he would "like to plead the Fifth." Id. ¶ 6; Doc. 30-2. After the disciplinary hearing officer determined that the evidence submitted established that Carter had in fact forged the correctional officer's initials on the packages, Carter was sentenced to five days in disciplinary segregation. Doc. 30-2; Doc. 32 ¶¶ 6–7. Carter was given credit for the time he had already served in administrative detention for a "net" of zero days in disciplinary segregation. Doc. 30-2; Doc. 32 ¶ 7.

3

An inmate may be placed in administrative detention if he is "charged with violating a major offense in custody and is awaiting a hearing" or "the offense in custody the inmate is charged with remains under investigation or review." Doc. 30-18 at 3–4; Doc. 32 ¶ 9. "Inmates placed in administrative detention pending investigation for committing an offense in custody [] should not remain in administrative detention for longer than fifteen consecutive days." Doc. 30-18 at 4; Doc. 32 ¶ 9.

On February 27, 2023, Carter was released from the S.H.U. to return to the general population. Doc. 30-3; Doc. 32 ¶ 15. Carter refused to leave the S.H.U. Doc. 30-3; Doc. 32 ¶ 16. Because of his refusal, Carter was written up for a facility rules violation. Doc. 30-3; Doc. 32 ¶ 15. On March 3, 2023, Carter was released from the S.H.U., but after he returned to the cell hall, he again refused the housing assignment and was returned to the S.H.U. on the same day. Doc. 30-4; Doc. 32 ¶ 17.

After Carter was returned to the S.H.U. on March 3, 2023, he was written up for two other facility rules violations. Doc. 32 ¶ 18. On March 5, 2023, when a correctional officer informed Carter that it was inappropriate for Carter to refer to a correctional officer using the officer's first name, Carter responded with an obscenity and threatened to sue the officer. Doc. 30-5; Doc. 32 ¶ 19. On March 6, 2023, Carter was written up for throwing a breakfast tray out the handcuff port of his S.H.U. cell across to the opposite wall. Doc. 30-6; Doc. 32 ¶ 21.

Inmates housed in administrative detention have regular access to Behavioral Health staff. Doc. 30-18 at 4; Doc. 32 ¶ 11. On February 6, 2023, before Carter was placed in the S.H.U., he was evaluated by Health Services staff and "cleared for admission" in the S.H.U. Doc. 30-7; Doc. 31 ¶ 6; Doc. 32 ¶ 13. On March 3, 2023, when Carter was returned to the S.H.U. because he refused assignment in the general population, Carter was again evaluated by

4

Health Services staff and cleared for admission in the S.H.U. Doc. 30-17; Doc. 32 ¶ 13. The DOC disciplinary housing policy provides for transfer from administrative detention to a secured mental health housing as deemed appropriate by Behavioral Health staff and the Associate or Deputy Warden. Doc. 30-18 at 5.

When an inmate is housed in the S.H.U., the inmate is seen by Health Services every two or three days when the nursing staff conducts rounds. Doc. 31 ¶ 8. During rounds, the nursing staff asks the inmate whether there are any medical or mental health issues or concerns. Id. From February 8 to February 26, 2023, Health Services saw Carter nine times during rounds for "Segregation Observation." Docs. 30-19–30-27; Doc. 31 ¶ 9. During each "Segregation Observation" encounter, nursing staff asked Carter whether there were any medical or mental health issues or concerns. Docs. 30-19–30-27; Doc. 31 ¶ 10. Carter did not notify the nursing staff of any medical or mental health issues or concerns. Docs. 30-19–30-27; Doc. 31 ¶ 10. Health Services saw Carter seven times from March 3, 2023 to March 12, 2023, for "Segregation Observation" during rounds. Docs. 30-28–30-34; Doc. 31 ¶ 14. During these encounters, Carter did not notify the nursing staff of any medical or mental health issues or concerns. Docs. 30-28–30-34; Doc. 31 ¶ 15.

While Carter was in the S.H.U., he submitted kites that were addressed during sick call. Docs. 30-8, 30-10–30-15; Doc. 31 ¶¶ 16–19, 21, 24. In the kites and subsequent sick call encounters, Carter did not raise any mental health concerns. Docs. 30-8, 30-10–30-15; Doc. 31 ¶¶ 16–19, 21, 24. On February 16, 2023, Carter was seen for a "Chronic Disease Encounter and State Mandated Physical." Doc. 30-13; Doc. 31 ¶ 20. He did not report any mental health concerns. Doc. 30-13.

On March 2, 2023, Carter reported a new onset of seizures and stated that he had experienced seven seizures in the last couple of days. Doc. 30-16. Carter questioned whether the seizures had "anything to do with being housed in the SHU for too long and being alone, otherwise [he was] unsure of what [was] causing [the seizure] activity." Id. at 1. When the nursing staff asked Carter why neither he nor his cellmate had activated the call light during any of the seizures, Carter responded, "I don't know[.]" Id. Carter was educated that during a seizure medical should be called to intervene. Id. The next day, the nursing staff reiterated that it was imperative to hit the call light for assessment if he had any further seizure activity. Doc. 30-17; Doc. 31 ¶ 30. There is no evidence in the record that Carter reported any further seizure activity.

In his new motions, Carter states that he was brutally assaulted on June 5, 2023, because he was housed with gang members. Doc. 38 at 2. Defendants do not dispute that Carter was involved in an altercation with another inmate on or about June 5, 2023, Doc. 41 at 5, but note that Carter instigated the altercation. The day after the altercation, Unit Manager Ekern "reviewed cameras to look into an assault that occurred the night before[.]" Doc. 41-1. The camera footage demonstrates that Carter challenged another inmate to come at him. Id. After Carter instigated the confrontation, the other inmate landed closed-fist punches to Carter's head and body. Id. The camera footage shows that staff responded, and the other inmate stopped assaulting Carter and began to walk away. Id. As the other inmate is walking away, Carter followed and continued to challenge the inmate. Id. The other inmate threw one more closed-fist punch at Carter. Id. Unit Manager Ekern's investigation concluded that Carter's actions and behavior directly led to the assault that occurred. Id. According to the Disciplinary Report filed

by Unit Manager Ekern, footage from a security camera corroborates the incident described in the report. Id.

On June 22, 2023, Carter represented to the Court that he had lost 50% of the vision in his right eye due to June 5, 2023, assault. Doc. 35 at 1. But Carter's medical records belie this representation. On June 28, 2023, Carter was seen for provider sick call. Doc. 42-1 at 2. A physician examined Carter and documented that Carter reported "no visual disturbances or other neurological deficits[]" due to the assault Id. at 3. According to the physician's note, during the June 28, 2023, encounter, Carter did not report any "blurred vision or any vision changes." Id. at 4.

Carter alleges that he is trapped in the S.H.U., is mentally ill, is not getting Americans with Disabilities Act accommodations, and is being "tortured." Doc. 38 at 2. Defendants submitted documentary evidence establishing that Carter has continued to refuse housing assignments when given the opportunity to leave the S.H.U. and return to his housing unit. Specifically, Carter refused transfers out of the S.H.U. on June 16, 2023, Doc. 41-4; June 21, 2023, Doc. 41-5; June 30, 2023, Doc. 41-6; and July 6, 2023, Doc. 41-7. Carter's allegation that he is not getting Americans with Disabilities Act accommodations appears to be based on the denial of a C2 mattress. See Doc. 37 at 2. But the record demonstrates that mental health notified Melissa Maturan that Carter did not have a C2 mattress while being housed in the S.H.U. on June 27, 2023, Maturan immediately notified the Unit Staff, and Carter was provided a C2 mattress the next day. Doc. 41-3.

Carter claims that he is being starved, cannot maintain proper hygiene, and has a body "littered in sores." Doc. 37 at 3. Carter accuses defendants of trying to feed him peanut butter when he is "deathly allergic[.] Id. at 2. Once again, Carter's medical records contradict his

7

allegations. On June 30, 2023, a correctional officer was conducting meal pass and provided Carter a sack lunch containing peanut butter. Doc. 41-10. Carter began yelling that the correctional officer was trying to kill him and stated that he is "deathly allergic to peanut butter." Id. The correctional officer offered to accommodate Carter with an alternate meal of a kosher sack, and Carter responded by yelling that a kosher sack is against his religion and accused the S.H.U. staff of trying to kill him and to violate his religious rights. Id. After completing meal pass, the correctional officer determined that Carter did not have any verified allergies or modified diets on record. Id. The correctional officer concluded that Carter had lied in an attempt to acquire a regular meal notwithstanding being on the Step program for refusing transfer from the S.H.U. Id.

During the June 28, 2023, sick call encounter, Carter complained of a rash on his arms, torso, and legs which had been present for the past year and a half, but had worsened, according to Carter's report, over the past two weeks. Doc. 42-1 at 3. Health Services had been providing treatment for the rash, but Carter reported that the treatments were not working. Id. In fact, in March 2023, Carter had a skin biopsy to determine the cause of his persistent rash. Id. at 5. After examining the rash and taking a history from Carter, the physician ordered labs, discussed possibly stopping certain medications that could worsen the rash, provided Carter wound care instructions for the rash, ordered an outside dermatologist referral, and instructed Carter to return if there was a worsening of his symptoms. Id. Although Carter's medical records indicate that he suffers from a rash, his records do not support the allegation that his body is "littered in sores[]" because he is being tortured.

## II. ANALYSIS

A temporary restraining order is issued only in the extremely rare instance in which court action must be taken without notice to the nonmoving party. Fed. R. Civ. P. 65(b). Because defendants were provided notice and filed a response, the Court will construe Carter's motion as a request for a preliminary injunction. See Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").

A preliminary injunction is an "extraordinary and drastic remedy[.]" Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (citation omitted). Carter, the party seeking preliminary relief, bears the burden of establishing the elements necessary for relief. Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003). Whether a preliminary injunction should issue is decided by weighing the four Dataphase factors: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on the other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). In a prison setting, a request for a preliminary injunction "must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.' " Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (quoting Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982)).

### A. Carter's Allegation that the Warden and Secretary of Corrections Are Torturing Him.

Carter's amended complaint alleges religious discrimination against him and focuses on issues of defendants not providing what he considers to be an appropriate diet. Doc. 27. Similarly, his original complaint focused on alleged violations of his religious rights. Doc. 1. Carter has sought preliminary injunctive relief because of conditions of confinement alleged to

9

be torture. Docs. 28, 38. To the extent Carter is seeking a preliminary injunction because of conditions of confinement in the S.H.U. and elsewhere, Carter's motion must be denied because his request for preliminary injunctive relief is not related to the allegations in his complaint or his amended complaint. The purpose of preliminary relief, such as a temporary restraining order or preliminary injunction, is to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the merits of the complaint. Dataphase, 640 F.2d at 113 n.5 (citation omitted). A plaintiff seeking injunctive relief "must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam). "It is inappropriate to grant a preliminary injunction for matters 'lying wholly outside the issues in the suit.'" Brakeall v. Stanwick-Klemik, 4:17-CV-04101-LLP, 2019 WL 3807272, at *1, 2019 U.S. Dist. LEXIS 136069, at *2 (D.S.D. Aug. 13, 2019) (quoting DeBeers Consol. Mines v. United States, 325 U.S. 212, 220 (1945)). In this § 1983 action, Carter does not assert that conditions of confinement are torture. Docs. 1, 27. To the extent Carter seeks preliminary injunctive relief because of allegations of torture not contained in his complaint or amended complaint, his request is denied. Devose, 42 F.3d at 471 (upholding district court's denial of motion for preliminary injunction when motion was based on new assertions of misconduct that were different from claim raised).

Carter's request for a preliminary injunction prohibiting his housing in the S.H.U. was denied because he had not met his burden of establishing that his placement in the S.H.U. is in any way related to the Warden and Secretary of Corrections penalizing him for his Satanic religious beliefs. In response to Carter's motion for preliminary injunction, defendants submitted an affidavit, Doc. 32, and disciplinary reports, Docs. 30-1, 30-3–30-6, establishing that Carter's

placement in the S.H.U. was consistent with the DOC's disciplinary housing policy and based upon Carter's violations of facility rules rather than his religious beliefs. Carter has presented his contentions, but no evidence to dispute what defendants submitted.

Finally, Carter has not provided any evidence to establish that the conditions of his confinement in the S.H.U. or elsewhere are "tortuous" and that his placement in the S.H.U. will irreparably harm him. Carter's previous request for preliminary injunctive relief seemed to be premised on the argument that placing a prisoner in a disciplinary housing unit or solitary confinement is, as a matter of law, unconstitutional. But this is not correct. "Segregating a prisoner from other prisoners, placing him in isolation or solitary confinement is not necessarily unconstitutional." Hancock v. Unknown United State Marshal, 587 F.2d 377, 378–79 (8th Cir. 1978) (per curiam) (citation omitted). Defendants have submitted evidence, which Carter does not refuted, that Carter refused multiple housing assignments that would have ended his placement in the S.H.U. Docs. 30-3–30-4; Doc. 32 ¶¶ 15-16; Docs. 41-4–41-7. Carter's unsubstantiated allegation that the conditions of his confinement in the S.H.U. are "tortuous" cannot be reconciled with this undisputed evidence.

Carter also summarily alleged that his "mental health is at a 'substantial risk of harm[,]' " Doc. 28 at 2, and repeats similar contentions, including contending that he is mentally ill. Docs. 37, 38. Without a showing of irreparable harm, a preliminary injunction should not be issued. Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989) (en banc); see also Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."). To demonstrate irreparable harm, Carter must show that the harm is "certain, great and of such imminence that there is a clear and present need for equitable relief." Gard v.

Kaemingk, 4:13-CV-04062-LLP, 2014 WL 4092776, at *2, 2014 U.S. Dist. LEXIS 114113, at *5-6 (D.S.D. Aug. 18, 2014) (quoting Packard Elevator v. Interstate Commerce Comm'n, 782 F.2d 112, 115 (8th Cir. 1986)). Carter has not met his burden of showing actual, substantial harm resulting from his placement in the S.H.U. or elsewhere, and his unsubstantiated allegations cannot be reconciled with the evidence defendants submitted in opposition to his motions. In short, many of Carter's latest contentions are debunked by his medical records.

Before Carter was placed in the S.H.U., he was evaluated by Health Services staff and "cleared for admission" in the S.H.U. Doc. 30-7; Doc. 30-17; Doc. 31 ¶ 6; Doc. 32 ¶ 13. While in the S.H.U., Health Services regularly assessed Carter during rounds. Doc. 31 ¶ 8. During rounds, Carter did not notify the nursing staff of any medical or mental health issues or concerns. Docs. 30-19–30-34; Doc. 31 ¶¶ 10, 15. While Carter was in the S.H.U., he submitted kites that were addressed during sick call. Docs. 30-8, 30-10–15; Doc. 31 ¶¶ 16–19, 21, 24. In the kites and subsequent sick call encounters, Carter did not raise any mental health concerns. Docs. 30-8, 30-10–15; Doc. 31 ¶¶ 16–19, 21, 24. Carter has not established that his placement in the S.H.U. places his mental health at substantial risk. And Carter's misbehavior after this Court's prior denial of issuance of a preliminary injunction explain much of his new complaints, including why he was assaulted by another inmate and why he received the meal containing peanut butter.

### B. Carter's Allegation that He Was Sent to the S.H.U. in Retaliation for Filing this § 1983 lawsuit.

Carter had alleged that he was sent to the S.H.U. in retaliation for filing this § 1983 lawsuit. Doc. 28. Once again, Carter has not submitted any evidence to substantiate this allegation, and Carter's unsubstantiated allegation cannot be reconciled with the evidence defendants submitted in opposition to his previous request for a restraining order. As previously

discussed, defendants submitted an affidavit, Doc. 32, and disciplinary reports, Docs. 30-1, 30-3–30-6, establishing that Carter's placement in the S.H.U. was consistent with the DOC's disciplinary housing policy and based upon facility rules violations. On the basis of this evidence, Carter's retaliatory discipline claim fails.[2] See Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008) (stating that a retaliatory discipline claim fails if the discipline was issued for the actual violation of a prison rule and there is "some evidence" that the inmate committed a rule violation).

### C.     Carter's Allegations that Defendants Have Threatened Him

In his previous request for preliminary injunctive relief, Carter asserted that the Warden, Deputy Warden, and Secretary of Corrections have threatened to place him in "gang housing" and instructed the gangs "to attack, hurt [and] kill [him.] Docket 28 at 1. He asserted that he is "terrified for [his] life . . . [because] Mr. Dan. Sullivan and Ms. Kellie Wasko are attempting to get [him] either really hurt (physically) or killed." Id. This Court held that these unsubstantiated, conclusory allegations devoid of even a single supporting fact are wholly insufficient to satisfy Carter's burden of establishing harm that is "certain, great and of such imminence that there is a clear and present need for equitable relief." See Gard, 2014 WL 4092776, at *2, 2014 U.S. Dist. LEXIS 114113, at *5-6.

In his renewed motion for restraining order, Carter asserts that he is "trapped in the S.H.U." where he suffers from relentless torture. Doc. 38 at 2; see also Doc. 37 at 3 (alleging

---

[2] Carter's complaint includes allegations that he was placed in the S.H.U. in retaliation for filing grievances and his attempts to practice his religion. Doc. 1 at 13; Doc. 1-1 at 11. The Court makes no finding whether Carter has established a sufficient relationship between the retaliatory conduct asserted in his complaint and the alleged retaliatory conduct claimed in his request for preliminary injunctive relief as Carter's request is denied for other reasons as set forth in this Opinion.

13

that he is "trapped in an endless cycle of punishment, designed to torture [him], and keep [him] in the S.H.U. forever."). Again, Carter has not alleged any specific facts to support his conclusory allegations. More significantly, however, after reviewing the documentary evidence that defendants submitted in opposition to Carter's renewed motion, Carter's bare allegations are belied by his medical records and video of his antagonizing another inmate prior to being assaulted. Carter's renewed motion for temporary restraining order also fails to meet his burden of establishing harm that is "certain, great and of such imminence that there is a clear and present need for equitable relief." See Gard, 2014 WL 4092776, at *2, 2014 U.S. Dist. LEXIS 114113, at *5-6.

### D.    Carter's Request for an Investigator

Carter's recent motion, Doc. 37, requests to speak to the U.S. Marshals Service, the Department of Justice, or a Bureau of Prisons investigator. Indeed, Carter wants this Court to send these people to him. Federal courts do not and cannot spearhead investigations into state inmate complaints about their state confinement; federal courts are neutral arbiters of disputes and cannot step out of that role by spearheading an investigation simply because one party to a lawsuit makes such a request. Carter is free to contact the U.S. Marshals Service or Department of Justice on his own, but this Court cannot take on the role of Carter's investigative arm.

### E.    Carter's Motion Compelling 24/7 Access to Lexis/Nexis and Phone Calls

Carter requests that this Court compel defendants to provide him 24/7 access to Lexis/Nexis and phone calls, including when he is in the S.H.U. so that he can pursue his pending cases, including this § 1983 action. Doc. 43. This Court construes Carter's motion as a modification of his request for preliminary injunction. In this § 1983 action, Carter has not

asserted a viable access-to-the-courts claim.[3]  Carter's request for preliminary injunctive relief is denied because Carter has no pending claim in this action alleging denial of access to the courts. Brakeall, 2019 WL 3807272, at *1, 2019 U.S. Dist. LEXIS 136069, at *2 ("It is inappropriate to grant a preliminary injunction for matters lying wholly outside the issues in the suit." (quotation omitted)).  Further, as previously noted, the record clearly establishes that Carter's continued placement in the S.H.U. is due to his repeated refusal of housing assignments when given the opportunity to transfer out of the S.H.U.

### F.  Rule 11 Sanctions

In their opposition to Carter's renewed motion, Defendants contend that "[t]he record clearly reflects that Carter continues to engage in blatant/outright lies in an on-going pattern of deceptiveness that appears to be nothing more than an attempt to mislead the Court." Doc. 41 at 10–11.  This Court has reviewed the record evidence Defendants have submitted in opposition to Carter's motions and letters seeking affirmative relief and agrees that Carter's claims appear to be dishonest and disengenuous.  This Court also agrees with Defendant that "[i]f Carter continues to engage in such behavior, his conduct may warrant appropriate sanctions." Id. at 11.

Although Carter is proceeding pro se, his pro se status does not excuse him from complying with the Federal Rules of Civil Procedure, including Federal Rule of Civil Procedure 11. Bennett v. Dr. Pepper/Seven Up, Inc., 295 F.3d 805, 808 (8th Cir. 2002); Beaner v. United States, 361 F. Supp. 2d 1063, 1068-69 (D.S.D. 2005) (granting defendants' motion to impose Rule 11 sanctions against pro se plaintiffs).  Federal Rule of Civil Procedure 11 provides in

---

[3] In a separate letter to the Court, which the Court construed as a supplement to Carter's complaint, Carter summarily alleged that prison officials "thr[ew] away [his] legal stuff" and "den[ied] [him] access to courts[.]" Doc. 8 at 1. But this claim did not survive screening. Doc. 26 at 16–17.

15

relevant part: "By presenting to the court a pleading, written motion, or other paper . . . an unrepresented party certifies that . . . it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and]. . . the factual contentions have evidentiary support[.]" Fed. R. Civ. P. 11(b). If the court determines that an unrepresented party has violated Rule 11(b), the court may impose an appropriate sanction to "deter repetition of the conduct or comparable conduct by others similarly situated." Id. ¶ 11(c)(1), (4); see also Beaner, 361 F. Supp. 2d at 1068 ("Rule 11 applies both to parties who are represented by counsel and to pro se parties as well." (citation omitted)). A Rule 11 violation does not require a finding of subjective bad faith by an attorney or unrepresented party. Beaner, 361 F. Supp. 2d at 1068 (citing N.A.A.C.P. Special Contribution Fund v. Atkins, 908 F.2d 336, 339 (8th Cir. 1990)). A plaintiff's "subjective belief and pro se status . . . do not insulate him from the reach of Rule 11." Id. (quoting Carman v. Treat, 7 F.3d 1379, 1382 (8th Cir. 1993)).

If Carter files further pleadings or motions or submits letters to the Court seeking affirmative relief that contain factual assertions that have no evidentiary support and are contradicted by the record evidence, this Court will consider a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 filed by Defendants, or the Court may, on its own initiative, order Carter to show cause why his conduct has not violated Rule 11(b). Fed. R. Civ. P. 11(c)(2), (3). Rule 11(c)(4) gives this Court discretion to consider a wide range of monetary as non-monetary sanctions up to and including dismissal of Carter's amended complaint with prejudice. See id. ¶ (c)(4); Rindahl v. Daugaard, 4:11-CV-04082-KES, 2011 WL 4549151, 2011 U.S. Dist. LEXIS 112148 (D.S.D. Sept. 29, 2011) (ordering dismissal with prejudice of pro se complaint as a Rule 11 sanction for pro se plaintiff submitting forged or fraudulent documents

and making false representations to the court); see also Pope v. Fed. Express Corp. 974 F.2d 982, 984 (8th Cir. 1992) ("When a litigant's conduct abuses the judicial process, the Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court." (citation omitted)).

### III. CONCLUSION

For the reasons stated above, it is hereby ORDERED:

1. That Plaintiff's request for a restraining order, Doc. 38, is denied.
2. That Plaintiff's motion to speak with federal authorities, Doc. 37, is denied to the extent that he is requesting this Court to spearhead his desired investigation.
3. That Plaintiff's motion compelling 24/7 access to Lexis/Nexis and phone calls, Doc. 43, is denied.

DATED this 17th day of July, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE