UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW CARTER,<br><br>Plaintiff,<br><br>vs.<br><br>KELLIE WASKO, SECRETARY OF CORRECTIONS, OFFICIAL CAPACITY; AMBER PIRRAGLIA, ACTING WARDEN, OFFICIAL CAPACITY; SAMUEL YOST, UNIT COORDINATOR, OFFICIAL CAPACITY; CRAIG MOUSEL, MAIL ROOM CLERK, OFFICIAL CAPACITY; TAMMY MERTENS-JONES, CULTURAL SPIRITUAL ACTIVITIES COORDINATOR, OFFICIAL CAPACITY; ARAMARK CORRECTIONAL SERVICES, LLC, IN ITS INDIVIDUAL AND OFFICIAL CAPACITIES; AND MARLIN'S INC., d/b/a CBM MANAGEMENT d/b/a SUMMIT FOOD SERVICES, IN ITS INDIVIDUAL AND OFFICIAL CAPACITIES;<br><br>Defendants. | 4:22-CV-04103-RAL<br><br><br>OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS WASKO, PIRRAGLIA, YOST, MOUSEL, AND MERTENS-JONES |

## I.    Procedural Background

Plaintiff Matthew Carter filed a pro se lawsuit under 42 U.S.C. § 1983. Doc. 1. This Court granted Carter leave to proceed in forma pauperis and ordered him to pay an initial filing fee. Doc. 6. After Carter timely paid his initial filing fee, this Court screened Carter's complaint under 28 U.S.C. § 1915A, dismissing the complaint in part and directing service upon Defendants Kellie

Wasko, Dan Sullivan,[1] Jessica Cook,[2] Samuel Yost, Craig Mousel, and Tammy Mertens-Jones. Doc. 11. This Court granted Carter's motion to amend his complaint to add new defendants and to bring additional claims against existing defendants. Doc. 26 at 1–2. This Court then screened Carter's additional claims under 28 U.S.C. § 1915A. Id. at 2–18. Defendants Kellie Wasko, Amber Pirraglia, Samuel Yost, Craig Mousel, and Tammy Mertens-Jones (collectively Defendants)[3] move for summary judgment on all of Carter's claims that survived § 1915A screening. Doc. 101. This Court extended Carter's time to respond to Defendants' motion for summary judgment four times, see Doc. 117; Doc. 119 at 2; Doc. 123 at 2; Doc. 136 at 3. Carter's final extension of extension of time expired on November 4, 2024. See Doc. 136 at 3. Despite these four extensions of time, Carter did not respond to Defendants' motion for summary judgment.

## II.    Factual Background

In accordance with D.S.D. Civ. LR 56.1.A, Defendants filed a statement of material facts presenting each material fact "in a separate numbered statement with an appropriate citation to the

---

[1] Carter's complaint and amended complaint include claims against Dan Sullivan, who was the former Warden of the SDSP, in his official capacity for injunctive relief which survived screening. Doc. 11 at 15–16; Doc. 26 at 19–20. When Teresa Bittinger became the Warden of the SDSP, Bittinger, in her official capacity, was automatically substituted for Dan Sullivan, in his official capacity, in accordance with Federal Rule of Civil Procedure 25(d). Doc. 34 at 3. Bittinger is no longer the Warden of the SDSP. Amber Pirraglia is the acting Warden of the SDSP. Pirraglia, in her official capacity, is automatically substituted for Bittinger, in her official capacity. See Fed. R. Civ. P. 25(d).

[2] Carter's claims against Jessica Cook in her official capacity for injunctive relief only were dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(2). Doc. 34 at 3–4.

[3] Carter's First Amendment free exercise claim for prison diet offerings, his RLUIPA claim for prison diet offerings, and his Fourteenth Amendment equal protection claim for religious discrimination in prison diet offerings against Marlin's Inc., d/b/a CBM Management d/b/a Summit Food Services (Summit) survived § 1915A screening. Doc. 26 at 6–10, 19–20. Summit also moves for summary judgment. Doc. 113. This Court addressed Summit's motion for summary judgment in a separate opinion and order.

record in the case." See Doc. 107. As the party opposing summary judgment, Carter "must respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1.B. "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1.D; see also Fed. R. Civ. P. 56(e)(2) (providing that the court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). This rule applies even when the nonmoving party is proceeding pro se. Johnson v. Kaemingk, 4:17-CV-04043-LLP, 2020 WL 1441713, at *1 (D.S.D. Mar. 23, 2020) (deeming facts admitted where a pro se plaintiff filed an opposition to a motion for summary judgment but did not comply with D.S.D. Civ. LR 56.1.B); Joe v. Walgreens Co/ILL, 4:09-CV-04144-RAL, 2010 WL 2595270, at *1 (D.S.D. June 23, 2010) (deeming facts admitted where a pro se nonmoving party did not submit a statement of material facts or directly respond to the moving party's statement of material facts); see also Bunch v. Univ. of Ark. Bd. of Trs., 863 F.3d 1062, 1067 (8th Cir. 2017) (holding that a litigant's pro se status does not excuse him from following the district court's local rules). Because Carter has not responded to Defendants' statement of undisputed material facts, Doc. 107, with separately numbered paragraphs and appropriate citations to the record, as required by D.S.D. Civ. LR 56.1.B, Defendants' statement of undisputed material facts, Doc. 107, are deemed admitted pursuant to D.S.D. Civ. LR 56.1.D.

## A.    The Parties

Carter professes to be a Satanist, and his claims arise out of alleged infringement of his ability to practice his religion while incarcerated at the South Dakota State Penitentiary (SDSP). See generally Docs. 1, 13; see also Doc. 107 ¶ 1. Defendant Kellie Wasko is the Secretary of the

South Dakota Department of Corrections (SDDOC).  Doc. 107 ¶ 3.  Carter's individual capacity claims against Wasko did not survive § 1915A screening, but some of his clams against Wasko in her official capacity for injunctive relief only survived screening.  Doc. 11 at 7–8, 15–16 (First Amendment free exercise claim, RLUIPA, First Amendment right to receive mail, Fourteenth Amendment equal protection, First Amendment retaliation claim).  Similarly, Carter's individual capacity claims against Dan Sullivan, the former Warden at the SDSP, did not survive § 1915A screening, but some of his official capacity claims against the SDSP Warden survived screening (First Amendment free exercise claim, RLUIPA, First Amendment right to receive mail, Fourteenth Amendment equal protection, First Amendment retaliation claim).  Doc. 11 at 7–8, 15–16; Doc. 107 ¶ 4.

Defendant Samuel Yost is a Case Manager[4] at the SDSP.  Doc. 106 ¶ 1.  Carter's individual capacity claims against Yost did not survive § 1915A screening, but some of his clams against Yost in his official capacity for injunctive relief only survived screening.  Doc. 11 at 7–8, 15–16 (First Amendment free exercise claim, RLUIPA, First Amendment right to receive mail, Fourteenth Amendment equal protection, First Amendment retaliation claim).

Defendant Craig Mousel serves as a mailroom clerk for the SDSP's incoming mail sector.  Doc. 107 ¶ 9.  Carter's First Amendment free exercise, RLUIPA, First Amendment right to receive mail, and Fourteenth Amendment equal protection claims against Mousel in his individual capacity and official capacity for injunctive relief survived § 1915A screening.  Doc. 11 at 8, 10, 12–13, 15.  Carter's First Amendment retaliation claim against Mousel in his official capacity only for injunctive relief also survived § 1915A screening.  Id. at 13–14, 16.

---

[4] In his filings, Carter refers to Yost as a Unit Coordinator.  See, e.g., Doc. 1 at 9.

4

Defendant Tammy Merten-Jones serves as the Cultural Activities Coordinator at the SDSP. Doc. 104 ¶ 1; Doc. 107 ¶ 10. Carter's First Amendment free exercise, RLUIPA, and Fourteenth Amendment equal protection claims against Merten-Jones in her individual capacity and official capacity for injunctive relief survived § 1915A screening. Doc. 11 at 8, 10, 12–13, 15. Carter's First Amendment right to receive mail and retaliation claims against Merten-Jones in her official capacity only for injunctive relief also survived § 1915A screening. Id. at 12–14, 15–16.

### B.    Relevant DOC Policies

The SDDOC's administrative remedy process is set forth in Policy 1.3.E.2. Doc. 102-2. The Administrative Remedy for Inmates policy requires an inmate to exhaust his administrative remedies by first submitting an Informal Resolution Request (IRR). Id. at 6. The administrative remedy process must be initiated within thirty days from "[a]ny adverse behavior, conduct or action by a staff member." Id. at 5. SDDOC staff have ten days to respond to the IRR. Id. at 7. If an inmate does not believe his grievance has been resolved through the IRR process, he has ten days to submit a Request for Administrative Remedy (ROR) form. Id. The Policy requires that "[a] copy or description/explanation of the staff member's response to the inmate's request for informal resolution must accompany the completed *Request for Administrative Remedy* form." Id. at 8; Doc. 107 ¶ 37. An inmate who is not satisfied with the response to the Administrative Remedy may, in some cases, appeal the decision to the Secretary for the SDDOC. Doc. 102-2 at 8–9. The Policy provides that "[e]ach inmate is responsible for obtaining their own copies of original document(s) submitted with his/her request for remedy." Id. at 2; Doc. 107 ¶ 37. "Inmates seeking remedy, who do not substantially comply with the requirements and procedures of the administrative remedy process, will have their request for remedy and all accompanying forms

returned with a brief explanation as to why their request was not processed[.]" Doc. 102-2 at 2; Doc. 107 ¶ 38.

The SDDOC's Inmate Correspondence Policy (1.5.D.3) provides that "[c]orrespondence and printed material inconsistent or contrary to the legitimate penological objectives of the DOC, including maintaining institutional order, discipline, safety, security, preventing escape and encouraging rehabilitation of inmates within the facility is not permitted and may be rejected and/or confiscated." Doc. 102-1 at 10; Doc. 107 ¶ 27. Materials that may create a threat to the safety, security and good order of the institution will be rejected in accordance with the Inmate Correspondence Policy. Doc. 102-1 at 10. If mailroom staff determines that printed matter or correspondence must be rejected or excluded, the inmate will be sent a Mailroom Correspondence Rejection Notice. Id. at 12. The inmate may choose to return the excluded or confiscated correspondence. Id.; Doc. 107 ¶ 30. If the inmate chooses to return the excluded or confiscated correspondence, the inmate must provide an addressed envelope with the appropriate postage to the mailroom staff. Doc. 102-1 at 12; Doc. 107 ¶ 30. The inmate may also request that a rejected item be destroyed. Doc. 102-1 at 12; Doc. 107 ¶ 30. "If the inmate fails to respond to the *Mailroom Correspondence Rejection Notice – Inmate* within 30 days from the date the notice was signed, and no appeal or Administrative Remedy is pending, mailroom staff may dispose of the correspondence, printed matter or item in an appropriate matter[.]" Doc. 102-1 at 13; Doc. 107 ¶ 31.

The SDDOC's Inmate Religious and Cultural Activities Policy (1.5.F.4) provides that "[i]nmate religious and cultural activities shall not conflict with the legitimate penological interests of the DOC or pose a risk to safety and security." Doc. 102-10 at 3. The Policy requires that "[i]nmates must submit all orders for approved inmate religious or cultural property, including

property purchased for a group through the group account, which must be approved by the inmate's Unit Manager, or by the CAC for group property." Id. at 8.; Doc. 107 ¶ 92. Before the request is forwarded to inmate banking for processing, the Policy provides that the "CAC will review the order to ensure all items requested are approved and the order is with an approved vendor[.]" Doc. 102-10 at 8; Doc. 107 ¶ 93. Inmates must purchase religious or cultural property from approved vendors due to security concerns. Doc. 107 ¶ 94.

The SDDOC's Inmate Religious and Medical Diets Policy (1.5.F.2) provides that "[a]n inmate requesting a religious [or alternative] diet must complete a *Request for Religious Diet . . .* and submit the form to the facility's Cultural Activities Coordinator." Doc. 102-14 at 2; Doc. 107 ¶ 109. According to the Religious and Medical Diets Policy, "[a]n inmate's request for a religious diet will be approved if providing the diet is within the inherent limitations of resources of the institution, does not burden the department's interest in preserving the security, safety and good order of the institution, or threaten the health and safety of the inmate or others." Doc. 102-14 at 2; Doc. 107 ¶ 110. The Religious and Medical Diets Policy requires that "[a]ny issues with providing a religious diet must be directed to the Cultural Coordinator." Doc. 102-14 at 2; Doc 107 ¶ 111. Inmates may appeal decisions regarding religious diets through the Administrative Remedy process. Doc. 102-14 at 2; Doc. 107 ¶ 112.

**C.    Satanic Bible**

Carter was provided Mailroom Correspondence Rejection Notice, signed by Mousel and dated March 8, 2022, informing him that he had received from Amazon a Satanic Bible that had been rejected because it depicts violence and may create a threat to the safety, security, and good order of the institution. Doc. 1-1 at 6–7; Doc. 107 ¶ 26. Carter submitted an IRR, dated March 14, 2022, alleging that he had been denied his "right to practice freedom of religion[]" because

Mousel had rejected a Satanic Bible he had received from Amazon because it depicted violence. Doc. 1-1 at 8; Doc. 107 ¶ 33. Carter received a response to his IRR advising him that "[a]fter consulting with the CAC, it was determined that SDSP does not allow an item such as a 'satanic bible.' You will not receive the items, but have the ability to have the book sent to someone. After 30 days, it will be discarded." Doc. 1-1 at 9; Doc. 107 ¶ 34. Carter then submitted an ROR, dated April 27, 2022, requesting that his "'Satanic Bible' be fully replaced & reimbursed" and that his religious rights no longer be infringed. Doc. 1-1 at 11; Doc. 107 ¶ 35. Carter's ROR was rejected because he did not attach the required documents. Doc.1-1 at 12; Doc. 107 ¶ 36. Because Carter's ROR was rejected on procedural ground, prison staff did not consider the merits of Carter's ROR. Doc. 107 ¶ 39. In his complaint, Carter submitted a kite-request slip to the mail room dated March 24, 2022, requesting the Satanic Bible that had been sent to him from Amazon. Doc. 1-1 at 3. Carter argued that "[a]ll Bibles portray violence, but as an American citizen, we have the right and freedom to practice religion[] [e]ven if that religion doesn't agree with other people's views." Id. Mousel denied Carter's request because the book had been reviewed by a group of staff before being rejected. Id. at 4.

The Satanic Bible teaches that life should be lived according to individual desires without regard for conscience or consequences and advocates preying on the weak in any way possible for one's own gratification. Doc. 107 ¶¶ 49, 51. The publication challenges its reader to rebel against the laws of man and God and declares that hatred of one's enemies and revenge are of utmost importance. Id. ¶ 50. Readers are encouraged to indulge in their natural desires to achieve physical, mental, and emotional gratification. Id. ¶ 54. The beliefs espoused in the Satanic Bible foster contempt, hatred, and violence toward others. Id. ¶ 53. The practices and beliefs espoused

in the Satanic Bible threaten institutional security and conflict with the SDSP's rehabilitative goals. Id. ¶¶ 55, 56.

### D.    Other Satanic Materials

The SDSP does not ban Satanic religious material in general. Doc. 107 ¶ 81. Rather, religious materials are regulated on a case-by-case basis. Id. Thus, while the SDSP may regulate the way in which a religion may be practiced, the SDSP does not per se ban any religion. Id. Carter is free to engage is methods such as meditating and praying to practice his religion. Id. ¶ 82. He may also request religious books, materials, or accommodation that are inconsistent with prison prohibitions. Id. For example, Carter requested and received Satanic literature, including The Necronomicon. Id. ¶ 83.

Carter submitted an IRR, dated March 14, 2022, requesting that he be "allowed to order all items regarding the religion [he is] practicing like: Healing crystals, honey, bread crumbs, a scrying mirror, obsidion [sic], a copper ritual sword, access to nature (like the moon, trees, grass), pine sap/resin, olieribos, access to candles, burn bowls, or an altar." Doc. 1-1 at 8. On September 15, 2022, Carter sent to Mertens-Jones a kite-request slip requesting that she "help [him] find a vendor for Satanic religious items." Doc. 102-8; Doc. 107 ¶ 91. Carter requested "a Ouija Board and a specific set of Tarot Cards called 'Angel Sigils Cards.'" Doc. 102-8; Doc. 107 ¶ 91. Some of the items that Carter requested had previously been approved to be used in a group setting at the SDSP. Doc. 107 ¶ 106. For security reasons, inmates are not permitted to possess in their cells certain items approved for use in group setting. Id. ¶ 107. These items, in accordance with the Religious and Cultural Activities Policy, must be stored in the group's designated property location. Id. ¶¶ 104, 106. The Policy provides that "[a] group must consist of at least two (2) inmates." Id. ¶ 108. Mertens-Jones informed Carter that because he was the only inmate practicing Satanism,

he would not be recognized as a group and limited in what he would be allowed.  Doc. 102-9 at 1. For example, candles are not allowed to be kept in cells and must be stored in a group locker box. Id.; Doc. 107 ¶ 103.

Because the vendor previously approved as a source for purchasing certain pagan items stopped working with prison systems, Merten-Jones had to search for an alternate source to purchase some of the items Carter had requested.  Doc. 107 ¶ 94.  Merten-Jones was not able to find a vendor specific to Satanism, but she was able to find sources for some of the items that Carter had requested.  Id. ¶¶ 95, 96, 97; Doc. 102-9 at 1–2.  In a kite-request slip dated December 9, 2022, Carter informed Merten-Jones that he was "trying to purchase a religious necklace (silver) and would like a picture and the price of an 'Eye of Horus.'"  Doc. 107 ¶ 100.  According to Carter, it is "a very prominent symbol with Satanism."  Id.  Mertens-Jones was not able to find the requested medallion.  Id. ¶ 101.  She explained to Carter that she had looked for the requested medallion but was unable to find one that meets the SDDOC guidelines from a vendor that would be approved.  Id.  Mertens-Jones suggested to Carter that he have someone on the outside look for one and send her information so she could determine whether it would be approved.  Id. ¶ 102.

Carter submitted an ROR, dated June 21, 2022, requesting that a rejected book, The Complete Book of Devils and Demons, be given to him.  Doc. 102-5.  Carter's request that the book be provided to him was rejected, but he was informed that because the cover of the book violated the SDDOC's pornography policy, the book was logged in his viewing room file in accordance with the pornography policy.  Id.; Doc. 107 ¶ 84.  The ROR response reiterated that Carter could request to view the material by contacting his unit team to arrange for the staff to provide him his viewing room file to review.  Doc. 102-5; Doc. 107 ¶ 84.

Carter was provided a Viewing Room Material Notice, dated July 8, 2022, advising that he had received correspondence containing nudity and/or sexually explicit material that was rejected in accordance with the Inmate Correspondence Policy but deemed appropriate for logging into his viewing room file and viewing in his unit's viewing room, as outlined in the Pornography Policy. Doc. 102-6; Doc. 107 ¶ 85. The Viewing Room Material Notice instructed Carter how to view the materials in his viewing room file. Doc. 102-6. The log of Carter's viewing room folder indicates that a publication titled <u>Energy Magick of the Vamprye</u> was logged in on July 8, 2022. Doc. 102-7.

On or about March 29, 2023, Carter was provided with <u>The Complete Book of Devils and Demons</u> and <u>Energy Magick of the Vamprye</u>, which had been kept in his viewing room file, and permitted to possess the publications in his cell. Doc. 107 ¶¶ 87, 89. Release of these publications to Carter resulted from an amendment to SDDOC's Pornography Policy to provide that "[a] publication may be allowed which would otherwise meet the definition of nudity or sexually explicit content if, the publication has literary, educational, scientific, artistic, religious, or historic value." <u>Id.</u> ¶ 88.

### E.    Prison Diet Offerings

Carter did not, as required by the Religious and Medical Diets Policy (1.5.F.2), complete and submit to the Mertens-Jones, the CAC, a request for religious diet or alternative diet form. Doc. 107 ¶ 113. Instead, Carter sent a kite-request slip to Mertens-Jones dated October 21, 2022. Doc. 102-12; Doc. 107 ¶ 114. According to Carter's kite-request slip, the meals that Aramark/Summit, the DOC's contracted food provider, "makes [are] not honorable to [his] God (Satan)." Doc. 102-12 at 2; Doc. 107 ¶ 22. Carter indicated that he was "trying to get on a diet more pleasing to [his] God (Satan)[,]" and he requested that Merten-Jones help him get on a

Satanic diet for his religion.  Doc. 102-12 at 1–2; Doc. 107 ¶ 114.  Carter's kite-request slip informed Mertens-Jones that he "ha[d] looked into it and the Satanic diet consists of the following:

> * Steak (medium rare) & Taco meat (10 oz)
>
> * Potatoes/French fries (1½ cup)
>
> * Chocolate Cake w/ vanilla & chocolate Ice cream
>
> * Fresh peaches (whole peaches)
>
> * Fruit Juice (Apple) and Cream soda

Doc. 102-12 at 1; Doc. 107 ¶ 120.  After receiving Carter's kite-request slip, Mertens-Jones contacted the Satanic Temple to determine whether there was any religious validity to Carter's request for a Satanic diet consisting of steak, taco meat, potatoes/French fries, chocolate cake with vanilla and chocolate ice cream, fresh peaches, apple juice, and cream soda.  Doc. 107 ¶¶ 123, 124. The Satanic Temple advised that they do not have specific dietary requirements but "could not speak to other Satanic sects' practices."  Id. ¶ 125.  Merten-Jones responded to Carter's October 21, 2022 kite-request slip and stated that "[a]ccording to the Satanic temple, there are no religious dietary restrictions or requirements."  Id. ¶ 126; Doc. 102-12 at 2.

In a subsequent kite-request slip dated October 31, 2022, Carter acknowledged that Mertens-Jones was "very correct in finding that their [sic] are no dietary restrictions or requirements with [his] religion."  Doc. 102-13 at 1; Doc. 107 ¶ 127.  According to Carter, this means he sets his own requirements and chooses "whatever [he] see[s] fit and pleasing to eat and nourishing to the devil's temple."  Doc. 102-13 at 1–2; Doc. 107 ¶ 128.  In other words, "[i]t's whatever [he] choose[s] to eat more or less."  Doc. 102-13 at 2; Doc. 107 ¶ 128.  Carter reiterated his request for steak, taco meat, potatoes/French fries, chocolate cake with vanilla and chocolate

ice cream, fresh peaches, apple juice, and cream soda but stated that "breakfast would be different and we can discuss that at a later time." Doc. 102-14 at 2; Doc. 107 ¶ 130.

Although Carter advised Mertens-Jones that he had looked into it, Carter did not provide any authority for his position that a Satanic religious diet requires that he be permitted to eat whatever he chooses. Doc. 104 ¶ 77. An inmate's request for a religious diet must be "within the inherent limitations of resources of the institution." Doc. 102-14 at 2. Permitting Carter to dictate to the SDDOC what he gets served to eat is not within the "inherent limitations of resources of the institution." Doc. 107 ¶ 131. After Carter's request for a Satanic diet was denied, he did not file a grievance in accordance with the Administrative Remedy process. Doc. 107 ¶ 116. Carter filed several grievances in October and November 2022, but none of those grievances asserted that his religious views and strict Satanic religious diet were ignored. Id. ¶ 117.

## F.    Retaliation

Carter received a Disciplinary Report regarding an incident involving a Correctional Officer on March 25, 2022. Id. ¶ 133. While the Correctional Officer was doing rounds, Carter asked about getting another blanket. Id.; Doc. 102-15. Carter had previously asked the Correctional Officer for another blanket, and the Correctional Officer informed Carter that he would have to wait until the Correctional Officer had time. Doc. 102-15; Doc. 107 ¶ 134. While the Correctional Officer was doing rounds, Carter became agitated and demanded that the Correctional Officer "give him that second blanket now." Doc. 102-15; Doc. 107 ¶ 134. The Correctional Officer responded by informing Carter that "he needs to have some patience." Doc. 102-15; Doc. 107 ¶ 135. Carter stated that he had "waited long enough and that [he] need[s] to go grab it now." Doc. 102-15; Doc. 107 ¶ 135. As the Correctional Officer walked away from Carter's cell, Carter stated that "[t]his is probably why you got stabbed[.] You need to get stabbed

again." Doc. 102-15; Doc. 107 ¶ 136. While the Correctional Officer was completing his rounds, he heard Carter yelling to other inmates that the Correctional Officer had gotten stabbed and that "he deserved it." Doc. 102-15; Doc. 107 ¶ 137.

Following the incident, Carter was written up and pled guilty to an M-6 Conduct write up. Doc. 102-16. Carter was referred for placement in Restrictive Housing, which Carter refers to as the "S.H.U." [Segregated Housing Unit], because he had "threatened to cause serious physical harm or injury upon a staff member, or threatened the life of a staff member in a manner which a reasonable person would conclude the inmate's intent is to cause serious physical harm or injury upon the staff member." Doc. 102-18 at 2; Doc. 107 ¶ 138. After a hearing, Carter received ten days in Restrictive Housing as punishment. Doc. 102-17. Carter's statement that the Correctional Officer deserved to be stabbed and needed to get stabbed again, in the opinion of prison staff, could incite other inmates to violence. Doc. 107 ¶ 139.

## III.    Legal Analysis

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (citation omitted). There is a genuine issue of material fact if "a reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens

& Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

### B.    Failure to Exhaust

Defendants contend that they are entitled to summary judgment in connection with any claim stemming from the rejection of the Satanic Bible because Carter failed to properly exhaust his administrative remedies. Doc. 102 at 6–10. Defendants also argue that Carter has failed to properly exhaust his administrative remedies regarding his prison diet offering claims. Id. at 51.

The Prison Litigation Reform Act (PLRA) provides that an inmate must exhaust all available administrative remedies before bringing an action with respect to prison conditions under either § 1983 or any other federal law. 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court." (citation omitted)). The PLRA requires "immediate dismissal" of all unexhausted claims. Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005).

Before filing this action, Carter was required to fully and properly exhaust his administrative remedies as to each claim in the complaint. See Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003). To properly exhaust administrative remedies, Carter must comply with the prison's procedures. Woodford v. Ngo, 548 U.S. 81, 102 (2006) ("[P]roper exhaustion" under the

PLRA requires prisoners to comply with the prison's deadlines and procedures.). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Bock, 549 U.S. at 218.

### 1.    Satanic Bible

After receiving a mailroom correspondence rejection notice, Carter submitted an IRR, dated March 14, 2022, alleging that he was denied his "right to practice freedom of religion" when a Satanic Bible that had been mailed to him was rejected because it depicted violence. Doc. 107 ¶ 33; Doc. 1-1 at 8. Carter was provided a response, which is dated March 25, 2022, denying his request to have the Satanic Bible delivered to him. Doc. 107 ¶ 34; Doc. 1-1 at 9. The response also informed Carter that after thirty days the item would be discarded unless he elected to have the book sent to someone. Doc. 1-1 at 9. Carter filed an ROR on April 27, 2022, requesting that his Satanic Bible be replaced and reimbursed and that his religious rights no longer be infringed. Doc. 107 ¶ 35; Doc. 1-1- at 11. Carter's ROR was rejected because he did not include the IRR form. Doc. 1-1 at 12; Doc. 107 ¶ 36. In his complaint, Carter concedes that he did not attach a copy of the IRR form, but he asserts that "it was readily accessible to [Jessica Cook] at any moment, but she did not care to help [him]." Doc. 1 at 9.

The Administrative Remedy Policy does not specifically require that that the IRR form be attached to the ROR. See Doc. 102-2. But the ROR form that Carter completed instructs that "[y]ou must attach a copy of your Informal Resolution Request and the response received from staff." Doc. 1-1 at 11. The Administrative Remedy Policy requires that "[a] copy or description/explanation of the staff member's response to the inmate's request for informal resolution must accompany the completed *Request for Administrative Remedy* form." Doc. 102-2

16

at 8; Doc. 107 ¶ 37. Carter's IRR was denied because "[a]fter consulting with the CAC it was determined SDSP does not allow an item such as a 'satanic bible.'" Doc. 1-1 at 10. Carter's ROR does not include a description or explanation of the response to his IRR, and he did not, as directed by the ROR form he completed, attach a copy of the IRR and the response he received. Id. at 11. Thus, Carter failed to comply both with the Administrative Remedy Policy and the instructions on the ROR form.

"An inmate satisfies § 1997e(a) by pursuing the prison grievance process to its final stage to an adverse decision on the merits." Porter v. Sturm, 781 F.3d 448, 451 (8th Cir. 2015) (internal quotation omitted). Because Carter's ROR was rejected on procedural grounds, he did not fully exhaust his administrative remedies by pursuing the prison grievance process "to its final stage to an adverse decision on the merits." Id.; see also Barnes v. Ark. Dep't of Corr., 485 F. App'x 151, 152 (8th Cir. 2012) (per curiam) (affirming dismissal for failure to exhaust administrative remedies when prisoner grievance appeal was denied as untimely and not decided on the merits). Carter's unsupported, conclusory allegation that Cook did not care to help him is insufficient to create a genuine issue of fact whether he properly exhausted his available administrative remedies in connection with any claim stemming from the rejection of the Satanic Bible.

### 2.    Prison Food Offerings

After Carter's request for a Satanic diet was denied, it is undisputed that he did not file a grievance in accordance with the Administrative Remedy process. Doc. 107 ¶ 116. Carter filed several grievances in this period; none of those grievances asserted that his religious views and strict Satanic religious diet were ignored. Id. ¶ 117. Thus, he did not exhaust all available remedies before commencing this action.

Because it is undisputed that Carter failed to exhaust his available administrative remedies regarding his claims stemming from the rejection of the Satanic Bible and his request for a Satanic diet, "[d]ismissal without prejudice is mandatory." Porter, 781 F.3d at 452 (citations omitted); see also Bock, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and unexhausted claims cannot be brought in court." (citing Porter, 534 U.S. at 524)). Mousel, Merten-Jones, Wasko, Pirraglia, and Yost are entitled to summary judgment on Carter's First Amendment free exercise, RLUIPA, Equal Protection, and First Amendment right to receive mail claims arising out of the rejection of the Satanic Bible and his request for a Satanic diet.[5] The Court will now consider the merits of Carter's exhausted claims.

## C.    First Amendment Free Exercise and RLUIPA Claims

"Prison inmates retain constitutional rights protected by the First Amendment, including the right to free exercise of religion." Singson v. Norris, 553 F.3d 660, 662 (8th Cir. 2009) (quoting Fegans v. Norris, 537 F.3d 897, 902 (8th Cir. 2008)). But a prisoner's constitutional rights are subject to limitation "in light of the needs of the penal system." Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 831 (8th Cir. 2009) (quoting Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 982 (8th Cir. 2004)). "A prison regulation or [policy] is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" Murphy, 372 F.3d at 982 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

When considering a First Amendment free exercise claim, the threshold question is whether prison officials have substantially burdened an inmate's sincerely held religious beliefs.

---

[5] Carter's First Amendment right to receive mail claim relates only to the rejection of the Satanic Bible. Additionally, Carter's claims against Mousel and Yost relate only to the rejection of the Satanic Bible. Doc. 1 at 9–11. Thus, this Court will not consider the merits of Carter's First Amendment right to receive mail claim or any of his claims against Mousel and Yost.

Mbonyunkiza v. Beasley, 956 F.3d 1048, 1053 (8th Cir. 2020).  To constitute a substantial burden, a prison policy or regulation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

Id. (quoting Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008)).  "Once it is determined that a regulation imposes a substantial burden on a prisoner," the court shall proceed to determine whether the regulation is reasonably related to legitimate penological interests. Gladson, 551 F.3d at 833 (citation omitted).

The Supreme Court has articulated four factors to aid courts in determining whether a prison policy is reasonably related to legitimate penological interests:

> (1) whether the policy has a valid rational connection to a legitimate governmental interest; (2) whether alternative means are open to inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the policy.

Hum. Rts. Def. Ctr. v. Baxter Cnty., 999 F.3d 1160, 1164 (8th Cir. 2021) (cleaned up) (quoting Overton v. Bazzetta, 539 U.S. 126, 132 (2003)).  "These so-called Turner factors present factual and legal questions for which 'the district court must necessarily find the facts that either support or undermine the constitutionality of a particular [policy], [but] the ultimate conclusion as to constitutionality is a question of law.'"  Id. (alterations in original) (quoting Hill v. Blackwell, 774 F.2d 338, 343 (8th Cir. 1985)).  In assessing the constitutionality of a particular policy or regulation, "[c]ourts are to give 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a

corrections system and for determining the most appropriate means to accomplish them.'" Id. (quoting Overton, 539 U.S. at 132).

A prisoner's RLUIPA claims is evaluated under a different standard than a First Amendment free exercise claim. Gladson, 551 F.3d at 832. By enacting RLUIPA, Congress recognized additional protection for religious exercise by institutionalized persons. Nat'l Am. Council of Tribes v. Weber, 750 F.3d 742, 748 (8th Cir. 2014) The statute provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). RLUIPA, as a threshold matter, requires a prisoner to show that there is a substantial burden on his ability to exercise his religion. Gladson, 551 F.3d at 832. "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA." Id. (quoting Patel, 515 F.3d at 813). Because the Supreme Court has instructed that "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion," that portion of the Eighth Circuit's definition of substantial burden requiring religious beliefs to be a central tenet or fundamental may not apply to a RLUIPA claim. Id. at 832 (quoting Cutter v. Wilkinson, 544 U.S. 709, 725 (2005)); see also 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief").

"[W]hen faced with both a Free Exercise claim and a RLUIPA claim, a court must, as a threshold matter, inquire as to whether the prison has placed a 'substantial burden' on the prisoner's ability to practice his religion." Gladson, 551 F.3d at 833 (citing Patel, 515 F.3d at 813). If the prisoner fails to present sufficient evidence that his ability to practice his religion has been substantially burdened, it is not necessary for a court to apply the Turner factors to the Free Exercise claim and the strict scrutiny test to the RLUIPA claim. Id. (citing Patel, 515 F.3d at 813).

Defendants contend that there is serious doubt as to the sincerity of Carter's religious beliefs based on a letter he wrote in November 2022 to Peter Popoff with the People United for Christ. Doc. 102 at 14; Doc. 107 ¶¶ 42, 47. Carter's letter does not reference Satan or otherwise suggest that Carter is a Satanist. Doc. 107 ¶ 46. In the letter, Carter professes to "believe that God will supernaturally set [him] free and bless [him] with money and people beyond [his] wildest dreams." Id. ¶ 43 (alterations in original). Carter also states that he prays that "God sets [him] free soon like a dove" and that "God blesses [him] abundantly." Id. ¶ 44 (alterations in original). According to Carter, he has been "faithful in the small things and pray[s] that God sees that [he] can also be faithful in the big things too." Id. (alterations in original). Carter's letter references Deuteronomy 28:1-2, which is an exhortation to remain obedient to the law of the Lord and provides that "[i]f you fully obey the Lord our God and carefully follow all His commands . . . the Lord your God will set you high above the nations of the earth." Id. ¶ 45.

Carter did not respond to Defendants' Statement of Undisputed Material Facts, and he has not submitted any record evidence to refute the evidence that Defendants rightfully contend raises serious doubt as to the sincerity of Carter's claims of Satanic religious beliefs. But the determination whether an inmate's religious beliefs are sincere is a factual one. Murphy, 372 F.3d at 983 ("Whether or not group worship is a sincerely held religious belief is a factual determination,

so we must not quickly dismiss such claims on summary judgment by concluding that those beliefs are not genuine."). At the summary judgment stage, it is more appropriate, in the Court's view, to assume without deciding that Carter's Satanic religious beliefs are sincere.

Carter alleges that Mertens-Jones, the Cultural and Spiritual Activities Coordinator, "has openly denied anyone from practicing Satanism within these walls." Doc. 1 at 11. He further alleges that Mertens-Jones "deliberately discriminates [against] anyone trying to practice Satanism." Id. at 11–12. Carter has submitted no evidence to support his bare assertions.[6] Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that to avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial" (internal quotation omitted)). The undisputed record evidence demonstrates that the SDSP does not ban Satanic religious material in general or prohibit inmates from practicing Satanism. Doc. 107 ¶ 81. The SDSP regulates religious materials on a case-by-case basis. Id.

There is no dispute that that Carter is free to engage is methods such as meditating and praying to practice his religion. Id. ¶ 82. There is also no dispute that he may also request religious books, materials, or accommodation that are not inconsistent with prison prohibitions. Id. For example, Carter requested and received Satanic literature, including The Necronomicon. Id. ¶ 83. Initially, two publications Carter requested, The Complete Book of Devils and Demons and Energy Magick of the Vamprye, were kept in his viewing room file because the publications contained

---

[6] Carter attached to his complaint two SDSP Cultural Activities Sign-Up forms for certain activities, including religious activities such as Muslim Juma Prayer, Catholic Mass, and Buddhist Meditation. Doc. 1-1 at 13–14. Contrary to Carter's allegation, these forms do not demonstrate that any of the Defendants "openly denied anyone from practicing Satanism[.]" Doc. 1 at 11. At most, the forms demonstrate that SDSP does not have scheduled group Satanic activities, which is not surprising because Carter, apparently, is the only inmate practicing Satanism. Doc. 102-9 at 1.

nudity and/or sexually explicit material, but when the SDDOC's Pornography Policy was amended, Carter was permitted to keep the publications in his cell. Id. ¶¶ 87–89. Finally, Mertens-Jones accommodated Carter's request for assistance in finding a vendor for Satanic religious items and was able to provide some of the requested items. Id. ¶¶ 95, 96, 97; Doc. 102-9 at 1-2. The undisputed record evidence refutes Carter's allegation that Mertens-Jones prohibits prisoners from practicing Satanism or deliberately discriminates against prisoners who want to practice Satanism.

In his complaint, Carter references "physical deprivations of religious materials[,]" and there is evidence that he is not permitted to possess certain religious items. Doc. 1 at 8; Doc. 102-9 at 1–2. Thus, as the Eighth Circuit has instructed, this Court must, as a threshold matter, consider whether Carter has demonstrated that the refusal to permit him to possess certain religious items places a substantial burden on his ability to practice his religion.[7] Gladson, 551 F.3d at 833. Here, Carter has not provided any evidence demonstrating that the refusal to permit him to possess certain religious items substantially burdens his ability to practice his religion  The IRR he filed along with his complaint asserts that he should "be allowed to order all items regarding the religion [he is] practicing[.]" Doc. 1-1 at 8. Carter requested that Mertens-Jones assist him to find a vendor for Satanic religious items, including a Ouija Board and a specific set of tarot cards called "Angel Sigils Cards," black/red candles, a Leviathan's cross necklace, and other things that pertain to his religion. Doc. 102-8 at 1–2.

Permitting Carter to possess all the religious items he requests may make his religious exercise more meaningful, but that is not the relevant test. Van Wyhe v Reisch, 581 F.3d 639, 657 (8th Cir. 2009) ("RLUIPA does not require the prison to permit an inmate to possess every

---

[7] Because Carter did not exhaust available administrative claims regarding his request for a Satanic Bible and a Satanic diet, the Court need not consider whether the denial of these requests substantially burdens his ability to practice his religion.

tangential item of property that could aid the inmate's religious exercise[.]"). Carter must present

facts from which a juror could conclude that the denial of prohibited items places a substantial

burden on his religious exercise. Because he has not done so, Defendants are entitled to summary

judgment on his RLUIPA[8] and Free Exercise claims. See id. (holding that prison officials are

entitled to summary judgment when a prisoner fails to present facts from which a juror could

conclude that the denial of additional *group* time to study Hebrew places a substantial burden on

his religious exercise); see also Collins v. Fikes, 2023 WL 3292857, at *6 (D. Minn. Feb. 6, 2023)

(finding that a prisoner failed to state a RLUIPA claim when the prisoner did not plead facts

showing the quantity or quality of any allegedly religious mail that was rejected or how the prison's

mail policy meaningfully curtails his ability to express his adherence to his religion), report &

recommendation adopted, 2023 WL 3276498 (D. Minn. May 5, 2023); Hamilton v. Countant,

2016 WL 881126, at *5 (S.D.N.Y. Mar. 1, 2016) (holding that a conclusory assertion that religious

items are central and critical to the exercise of religion are insufficient to establish a substantial

burden on religious exercise).

### D.      Fourteenth Amendment Right to Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires the government to

"treat similarly situated people alike." Murphy, 372 F.3d at 984 (quoting Rouse v. Benson, 193

F.3d 936, 942 (8th Cir. 1999)). To establish an equal protection violation, Carter must show: (1)

that he was treated differently than a similarly situated class of inmates, (2) the different treatment

burdens a fundamental right, and (3) there is no rational relation between the different treatment

---

[8] Carter brings a RLUIPA claim against Mertens-Jones in her individual capacity. See generally Doc. 1; Doc. 11 at 10, 15. Recently, the United States Court of Appeal for the Eighth Circuit held that individual capacity claims are not cognizable under RLUIPA. Barnett v. Short, 129 F.4th 534, 542–43 (8th Cir. 2025). Thus, Mertens-Jones is entitled to summary judgment on Carter's RLUIPA claim against her in her individual capacity for this reason as well.

and any legitimate penal interest. Id. (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). Carter must also establish that the different treatment is based upon either a suspect classification or a fundamental right. Patel, 515 F.3d at 815 (citations omitted). Religion is a suspect classification. See Burlington N. R.R. v. Ford, 504 U.S. 648, 651 (1992) (describing race or religion as suspect classes). Finally, Carter must demonstrate that the denial of certain religious items he requested was motivated by intentional or purposeful discrimination. Patel, 515 F.3d at 816.

In his complaint, Carter suggests that inmates practicing other religions are permitted "violent/horrible books all 'depicting violence.'" Doc. 1 at 12. While the Torah and Christian Bible contain many passages describing violent acts, these texts do not conventionally "depict" violence like the Satanic Bible Carter wanted. Carter has submitted no evidence to substantiate these allegations. He has also not submitted any evidence that any similarly situated inmate has been permitted to possess any of the religious items he has requested but has not been permitted to have.[9] Finally, Carter has not presented any evidence suggesting that the denial of any religious item he requested was motivated by intentional or purposeful discrimination based on his religious beliefs. To the contrary, the record demonstrates that Mertens-Jones considered Carter's requests in accordance with the provisions of the SDDOC's Inmate Religious and Cultural Activities Policy, which apply to all religions, Doc. 102-10, and diligently attempted to locate approved items from approved vendors, Docs. 102-9; Doc. 107 ¶¶ 95, 96, 97, 101, 102. For these reasons, Defendants are entitled to summary judgment on Carter's equal protection claim.

---

[9] No inmates are permitted to keep candles in their cells, but candles can be stored a group's designated property location and used in a group setting. Doc. 107 ¶ 103. It is undisputed that "[a] group must consist of at least two (2) inmates," and Carter is the only inmate practicing Satanism. Id. ¶ 108; Doc. 102-9 at 1. Thus, Carter is not similarly situated to inmates who are permitted to use candles in a group setting.

### E.    First Amendment Retaliation Claim

Carter's complaint, when liberally construed, alleges that he was placed in Restrictive Housing in March 2022 in retaliation for filing grievances and attempting to practice his religion. Doc. 1 at 13; Doc. 1-1 at 11.  To state a First Amendment retaliation claim, Carter must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Spencer v. Jackson Cnty., 738 F.3d. 907, 911 (8th Cir. 2013) (quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)). Carter may maintain a cause of action for retaliatory discipline if he demonstrates that prison officials filed disciplinary charges in retaliation for his exercise of constitutional rights.  Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008).  But a retaliatory discipline claim fails if the "alleged retaliatory conduct violations were issued for the actual violation of a prison rule." Id.  In other words, "a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." Id.

It is undisputed that Carter was placed in the restrictive housing unit on March 28, 2022, for threatening a correctional officer. Doc. 102-18 at 2; Doc. 107 ¶¶ 133, 138.  It is also undisputed that Carter did, in fact, threaten a correctional officer on March 25, 2022. Docs. 102-15; Doc. 107 ¶¶ 133–137.  In fact, Carter pled guilty to the disciplinary charges arising out of the March 25, 2022 incident in which he told a correctional officer that he deserved to be stabbed and needed to be stabbed again. Doc. 102-16.  Because Carter was placed in the restrictive housing unit in March 2022 after pleading guilty to the violation of a prison rule, Defendants are entitled to summary judgment on Carter's First Amendment retaliation claim.

The record demonstrates that Carter has been placed in the restrictive housing unit during the pendency of this action,[10] but he has not moved for leave to file a supplemental complaint based on disciplinary action to which he has been subjected since filing his complaint. Instead, Carter filed a series of motions seeking immediate injunctive relief based on conclusory allegations, unsupported by any record evidence, that he has been "kidnapped" and is being "tortured" while being held in the restrictive housing unit for reasons unknown to him. See Docs. 28, 38, 120, 133, 137. Defendants responded to each of Carter's motions with competent evidence that each of Carter's placements in the restrictive housing unit has resulted from conduct that violates prison rules. See, e.g., Docs. 30, 31, 32, 41, 124, 125, 126, 138, 139. Accordingly, this Court denied Carter's motions seeking immediate injunctive relief because Carter failed to provide any evidence that placement in the restrictive housing unit was "tortuous" or retaliatory. See Docs. 40, 47, 148.

For these reasons stated above, it is

ORDERED that Defendants' motion for summary judgment, Doc. 101, is granted.

DATED this 26th day of March, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

---

[10] Docs. 28, 38, 120, 133, 137.